Morgan, J.,
dissenting:
With deference to the .view of my associates, I do not concur in the reversal. The judgment was just and, for this reason alone, it should not be reversed. The irregularities complained of occurred by reason of the desire to. reach the truth at the trial, and not in a single instance did the lower court commit any irregularity that affected the substantial rights of the parties.
The maj ority opinion says the action is for damages for the breach of a contract; but the complaint and the evidence, from my view, were for damages on account of the fraud practiced upon the plainitff, the negotiations concerning the contract being only a statement of a part of the circumstances constituting the fraud charged. The complaint as construed by the court and- the evidence comprise three charges of fraud, chronologically stated:
First, that plaintiff was induced, by the fraud and deceit of Hitchcock, to purchase 21,000 shares, by being led to believe that Hitchcock had conveyed to the company about $50,000 worth of real property for 56,000 shares, the remaining 54,000 being treasury stock that was being sold to raise money to build a bath house on the real property; when in fact the 56,000 shares had been issued without, consideration and the company did not o.wn any real estate, but plaintiff’s $21,000 was used to take up options the company had on it.
Second, that the plaintiff’s wife, as a stockholder, brought suit to require an accounting for the treasury stock, of 54,000 shares, and to require the 56,000 shares to be returned to the company by Hitchcock, on the ground. *139 that such shares were issued without consideration, and to enjoin any transfer thereof. Temporary injunction was issued, and was never dissolved, so far as this record shows. An accounting was made by Hitchcock, as to the treasury stock, and judgment entered against him in favor of the company for $24,308.59, which it was found he owed the company on treasury stock disposed of by him, but no adjudication, further than the injunction, was had as to the 56,000 shares. That during the pendency of that suit, Creighton and another were elected as two of the three directors, by voting the 56,000 shares, in disregard of the vote of the 21,000 shares of the plaintiff, in August, Í907; that in February following, the two directors aforesaid, having in the meantime taken possession of the books of the company and having assumed the absolute control and management of the company’s affairs, plaintiff refusing to act, amended the by-laws, set a new date for annual meetings, and by the vote of the sume stock, transferred, in the meantime to Creighton without consideration, elected three directors, consisting of Creighton and two others, who in March following, made a fraudulent assignment for the benefit of creditors; that plaintiff sued them and the assignee, alleging the fraudulent purpose of the assignment and asked an injunction against the assignee from further proceedings therein. Considerable evidence was introduced herein, tending to prove the fraudulent purpose of this assignment.
Third, that, in order to settle all differences between the plaintiff and Creighton, and to satisfy the plaintiff’s rights and claims, Creighton proposed to plaintiff, and, it is alleged that he agreed, of plaintiff would desist from prosecuting his action against the assignee,' and drop all other litigation, that .he, Creighton, would organize a new company — after the assignment proceedings had been first closed, the property sold, and the assignee discharged — and have the purchaser at the assignee’s sale transfer all the *140 property to the new company and have new shares issued to the plaintiff, to satisfy his rights, and to Creighton, and othef- stockholders to satisfy their rights, and to pay them for the money actually invested, and that he, Creighton, would build a $30,000 bath house, apparently from the sale of stock in the new company. That after the assignment was closed, and the property transferred to the new company, Creighton refused to go any further with the alleged contract, and refused to recognize the plaintiff’s rights thereafter, but issued all of the shares in the new company to himself, except three shares, of one dollar each, one to ach of the three directors thereof, thus completely ignoring plaintiff, who was thus deprived of his money and of all interest in the property into which it had been converted.
These allegations were immediately followed by a closing statement in the complaint: “that by said acts of the said defendants and each of them this plaintiff has been damaged to the amount of $40,000.” The court submitted the negotiations concerning the contract as a part of the “said acts.”
Plaintiff introduced his testimony in the order of the allegations in the complaint, showing that he had been deceived in the purchase of the stock originally; that the defendant Creighton had oppréssively and fraudulently used the 56,000 shares of stock, which it clearly appeared were issued without consideration to Hitchcock, and had been transferred to Creighton with such knowledge, and, by such use of it, he had thereby oppressively and fraudulently obtained absolute control and management of the company, and had fraudulently made the assignment for the benefit of creditors, and, through the negotiations concerning the contract, had lulled the' plaintiff into security, and caused him thereby to refrain from pressing his suit against the assignee, and thereafter by the sale and transfer of property, had converted to his own use, and the use of the defendant company, all of the property of the old com *141 pany, without paying anything to the plaintiff, or to anyone else, for it, except about $12,000 that was bid for the property at the assignee’s sale, which was used to pay off indebtedness of the company, consisting of $5,000 due Creighton for claims allowed by the assignee and assigned to him, and of about $7,000 borrowed money and other claims and expenses. Thus showing plaintiff’s damage, through and by reason of the various acts of fraud charged, and measured by the interest plaintiff had in the property so fraudulently obtained by the defendants, plaintiff obtained judgment for an amount much less than the value of the property, after deducting the $12,000 Creighton paid for it at the sale, and less than the value of his interest therein.
It is true the lower court instructed the jury that plaintiff had failed to prove an absolute contract of settlement and told counsel, on overruling a motion, for judgment for the defendants and nonsuit, at the close of plaintiff’s case, that he would submit the negotiations concerning the contract to the jury, and he did afterward so instruct them, for their consideration, in so far, only, as such negotiations would throw light upon the fraud charged against the defendants. The defendants, without objection tot such statement of the court, proceeded to introduce their testimony in defense of the charges of fraud, and maide no objection to the instruction, aforesaid, thus acquiescing in the ruling of the court, and accepting the issue thus made, upon the question of fraud. The verdict of the jury was against them for only $15,550, which the jury, no doubt, considered the actual value of plaintiff’s interest 'in the property so taken from him by the defendants.
.Thus it appears that the action was not for a breach of contract, and even if it were partially so, as originally stated in the complaint, the court narrowed and limited the issues to the one question of fraud, and submitted the negotiations concerning the contract for the jury’s consideration as to the fraud charged against the defendants *142 Such narrowing of the issues was not only a wise action on the part of the lower court, but was acquiesced in by the counsel for the defendants, as shown by three things: First, they denied in an amended answer, “that the defendant, Creighton, made the representations to the plaintiff alleged in paragraph 6,” in reference to the contract, and denied “that the plaintiff did or refrained from doing any matter or thing whatever by reason of the alleged agreement or any agreement with the defendants”; thus aiding the complaint, and showing an actual joinder of issues concerning the effect of these negotiations; second, the defendants introduced their evidence on the issue of fraud, thus accepting such issue; third, the defendants made no objection whatever, and saved no exception, to the instruction of the court submitting the negotiations concerning the contract for whatever light' they might throw upon the charge of fraud, thus acquiescing in the issue submitted.
All negotiations concerning the contract (which included Creighton’s offer to pay and satisfy plaintiff, and to persuade him to drop his suit against the assignee and the directors who made the assignment, one of whom was Creighton, by the transfer to plaintiff of a sufficient number of shares in the new company to be organized) were pertinent facts, tending to prove a consequent admission of the fraud charged; an acknowledgment of plaintiff’s rights and interests. If the 56,000 shares had not been fraudulently used to control the company, if the assignment was in good faith, why were these negotiations carried on, the purpose of which was to stop the suit against the assignee, and to settle with plaintiff? And if the negotiations were in good faith, why were they so completely repudiated after the defendants obtained the property? The court properly submitted these negotiations to the jury as part of the fraud charged.
Thus it not only appears that the non-suit was properly denied, but that the defendants waived the alleged error in *143 refusing it, although the majority opinion concludes that the overruling of the motion for a directed verdict and non-suit was sufficient to reverse the case.
The defendant, Creighton, stated in his answer that he did not have and could not obtain sufficient knowledge or information upon which to base a belief, as to the allegations, that he never did at any time own to exceed 220 shares of stock in the company. This must be taken as an admission that he never owned the 56,000 shares with which he obtained control of the company, and the court so instructed the jury, and defendants made no objection and saved no exception thereto.
The evidence for the defense consisted almost entirely in an effort to prove the necessity and validity of the assignment, and the proceedings therein terminating in the assignee’s sale. They did put plaintiff on the witness stand, and he reiterated that he was deceived and fraudulently induced to buy the shares in the company; that the 56,000 shares were originally issued without consideration to Hitchcock, then to his brother Dean, and then to Creighton; that the assignment was illegal, and a maj ority of the claims filed in that proceeding were illegal; that the having of the 56,000 shares by Creighton at the annual meeting and his assuming control was one cause of his loss and damage, together with the testimony that he did nothing to hinder the assignee’s sale, and that Creighton and the company now had all the property that was paid for with his money.
They did not put Creighton or any one of the directors of the defendant company on the stand. They ought to have been able to testify, if it were true, that they were not guilty of the fraud charged. They knew whether the 56,000 shares were fraudulently used to obtain control of the company and to make the assignment, and to thus obtain all the property of the company. Their failure to testify must have been considered by the jury. It was a' circumstance far from favorable to Creighton, or to the three directors, *144 all of whom had been Creighton’s attorneys in regard to matters involved in this suit.
The majority opinion concludes that the judgment should be reversed, because the court in stating the issues made by the pleadings made misstatements prejudicial to defendants.
The entire scope and purport of the complaint was to state facts constituting the fraud by which plaintiff was deprived, first of his money, and afterward of the property purchased with his money, and that the defendant Creighton had knowledge of those facts, did them himself, or consented to and approved them, and accepted the fruits thereof; and the instruction relied upon as reversible error was a general statement of the allegations as construed by the court, and could not have deprived the defendants of any substantial right. The same may be said as to the part of the 7th instruction, considered as reversible error, with the additional reason that defendants made no objection and saved no exception to it. They acquiesced in it. As to instruction No. 9, wherein the court included Creighton as a director making the $1500 loan, this was a mistake, as he was not a director then. It was quite immaterial, however, whether he assisted in making this loan; the charge was that it was made contrary to the by-laws of the company, and over protest. The jury could not have been misled by this very slight mistake. Furthermore, it is corrected by other instructions where it is plainly stated that Creighton first became a director in August, 1907, a year after .the said loan; and, in another instruction, the directors’ names are stated who made this loan. There was no such assuming of the existence of evidence here as referred to in the authorities cited in the majority opinion.
It is then concluded in the majority opinion that reversible error was committed in the same instruction by instructing that Creighton could not become a “director” under the by-laws without he owned 1000 shares, when the *145 allegation was that no one could become an “officer” without owning 1000 shares. The evidence disclosed that Creighton was a director and an officer — vice-president— elected by Hitchcock’s voting the 56,000 shares for him before he even claimed to own but 220 shares. These are infinitesimal technicalities, and if the reversal of this judgment be based upon such errors, then it is doubly true that “mortal vision is a grievous bar to perfect judgment.” It may be exhilarating and pleasing to exercise the mind and stimulate the ambition, in working out the enigmas of technical procedure, but it is “our pleasant vices that make instruments to scourge us.”
The majority opinion says that “it does not appear that the transfer to Creighton of the 56,000 shares was without consideration nor merely colorable; therefore, prima facie, he had the right to vote the stock and act as a director-, even though he was a merely nominal owner.” But he admitted in the pleadings, and the court instructed the jury without his objection or exception, that he never owned to exceed 220 shares. This admission is clear and was certainly intentional, because an amendment was made to the answer for the specific purpose of denying, directly, allegations of the complaint, and this allegation was denied again on information and belief.' The certainty of such intention to admit is shown by the fact that no objection was made to the instruction telling the jury such fact was admitted. Creighton did not testify at all, and he did not allege that they were ever paid for, and the plaintiff proved that the only way Creighton ever became a director was by the vote of these shares, over the vote of plaintiff’s 21200 shares; and that by these shares another director who never owned 1000 shares was elected, constituting a majority of the board, and that' these two changed the by-laws, set another date for an annual meeting, elected three directors at an annual meeting “held in accordance with the new bylaws,” made an assignment for the benefit of creditors, *146 and thereafter sold the property and conveyed it to the new company, and issued all the stock therein to Creighton, except three shares. Now, where is the prima facie right even to act as a director, to say nothing of what he did thereafter ?
Another error is found in the 9th instruction: that the court told the jury if they believed Creighton claimed to own the 56,000 shares, and at the same time knew that the same had not been paid for, and knew of the' fraudulent representations of Hitchcock and the old company, such claim would constitute a fraud. The majority opinion says this was error, because “it is not alleged nor proved that Hitchcock did not cause the real estate to be conveyed to the company before he assigned the stock, or it came into the hands of Creighton.” This was not error. The instruction is too favorable to defendants. They admitted that Creighton never owned these shares. Creighton did not allege, nor testify, that he did, but admits he did not; and, to the charge that he never owned to exceed 220 shares, he says in his answer that he did not have sufficient knowledge or information upon which to base a belief. Furthermore, he became a director and vice-president of the company, and acted as such, for about five months before he ever claimed to own but 220 shares, thus haying ample knowledge of the company’s affairs, and especially as to whether these shares had ever been paid for; for, before he voted them for himself and the other two directors, and while he was a director and vice-president, the judgment for $24,000 was obtained for the company against Hitchcock for the balance Hitchcock owed the company on his disposition of the 54,000 shares of treasury stock, rendered on a report of a referee that showed conclusively that Hitchcock had never paid the company anything for the 56,000 shares, but lacked $24,000 of having turned over property to the company as the equivalent of the 54,000 shares of treasury stock. Furthermore, the referee’s report showed that *147 plaintiff’s money had been used to pay for about all the property the company owned at that time. Furthermore, the complaint in that case alleged Hitchcock’s fraud; and a director and vice-president would know of all the proceedings in a suit in which his company obtained a judgment for $24,000, and would know that Hitchcock never did transfer any property to the company for the 56,000 shares. And defendants do not deny in the instant case the allegations of Hitchcock’s fraud, and that he never paid anything for these shares, but only'deny that they knew it.
The majority opinion says this judgment of $24,000, prima facie, settled all issues in that case and “left the stock standing in the name of Hitchcock’s assignees including Creighton.” Now, Creighton never claimed these shares at-that time; this judgment was obtained in January, and the only evidence indicating that these shares were ever even transferred to him was plaintiff’s testimony from a memorandum that the books showed a transfer February 7, 1908, about 12 days after the judgment, and 3 days before Creighton voted them for himself, as director. So Creighton was not an assignee when the judgment was entered. As to the money judgment, prima facie, settling all issues, the record in that proceeding showed the contrary; after a temporary injuiction was issued as to any transfer of these shares, Hitchcock filed an answer, saying he had transferred the shares to his brother before he knew of the injunction; and the court appointed a referee, and ordered an accounting as to the 54,000 shares of treasury stock, and in such order all other issues were continued until the report of the referee was made, upon which the court rendered the judgment for $24,000, without any adjudication concerning the 56,000 shares, neither Hitchcock’s brother nor Creighton being defendants.
And even if the 56,000 shares were left in Hitchcock’s brother as assignee, there was no adjudication that he owned them or that they were not assigned without con *148 sideration,.'but, on the contrary, no finding or adjudication was made concerning them; nor would such leaving of the shares in the said assignee’s hands overcome the admission of Creighton that he never owned to' exceed 220 shares, or his admission of the charge that Hitchcock never paid anything for them, coupled with his failure to testify on any issue.
The majority opinion says that the judgment should be reversed, because the court instructed the jury that if they believed all the matters or things, set forth in the complaint were done by or with the knowledge and consent of Creighton, and in furtherance of Hitchcock’s fraud upon plaintiff, they should find for the plaintiff. This was not error, first,, because it was favorable to defendants. It required the jury to find that all of the matters and things were done to defraud the plaintiff; second, if Creighton adopted, carried- on and used for his own benefit the fraud of Hitchcock, together with the things he did, on his own initiative, thereafter, the verdict should have been for the plaintiff; third, other instructions clearly define the issues so that this instruction is made clear to the jury.
The majority opinion says that the lower court, by instruction No. 10, committed fatal error “in that it did not give the proper measure, or any measure, of damages.” One reason why such alleged omission to instruct was not reversible error is that the defendant did not ask for any such instruction, never-objected to the instruction given for this reason, and never called the court’s attention to the matter, but objected only on the ground that no instruction at all, as to damages, should have been given. It is true that there are instances where the court should give such an instruction, of its own motion, but this is not one of them. In the case of Mustang Co. v. Hissman, 49 Colo., 308, 112 Pac., 800, and Colo. Spgs. Co. v. Albrecht, 22 Colo. App., 201, 123 Pac., 957, cited in the majority opinion, there was a clear dispute at the trial as to the proper measure *149 of damages, and a proper instruction was refused, and the issue was the.amount of damages actually sustained. In such instances the court should guide the jury by appropriate instructions. In the present case the contention of defendants is, and was at the trial, that no damage was sustained and none proved. Furthermore, if the court had given to the jury such an instruction it could not have caused the jury to find a verdict for a less amount under the evidence.
There was mo reversible error pertaining to the answer of the jury to the special interrogatory, for two reasons: First, the answer discloses only one way in which plaintiff was damaged, if it discloses any way that he was damaged, and is not, therefore, inconsistent with the general verdict. The answer discloses one of'the ways in which the plaintiff was defrauded rather than damaged, but two more charges of fraud were made upon which the verdict may stand. If the answer does not exclude every other conclusion that will authorize a recovery for the plaintiff, then it is not inconsistent with the general verdict; and if not inconsistent, the general verdict should stand. 2 Thompson on Trials, 1958 (2nd Ed.); Drake v. Justice G. M. Co., 32 Colo., 260, 75 Pac. 912. The special findings will not control the general verdict “unless invincibly antagonistic to it.” Thomp. on Tr., 1962, 1967; D. & R. G. R. R. Co. v. Bedell, 11 Colo. App., 140, 54 Pac., 280. Second, the interrogatory was confusing and misleading, as the' answer shows. If the question had been how was the plaintiff defrauded, it would have been responsively answered in part. But that was not the question, and the answer was therefore' indefinite. The question propounded was intended to elicit a different response. Counsel should have required the jury to answer it, if possible. The question was confusing also because it did not call for a “particular question of fact,” as the' Code provides. Special findings of facts by a jury are often wise precautions, but in order that they may not be used to con *150 fuse and to furnish error, they should be made only as to definite and particular questions of fact, and not as to the evidence on which a question of fact is based.
The majority opinion concludes that the defendants were denied a substantial right because the trial did not proceed in all respects in compliance with the orderly procedure designed for the purpose of making up issues for trial and for the conduct of trials. The trial of this cause required about nine days in the lower court, and there are in the record many instances that required discretion, but the only actual deviation from reasonable regularity consisted in the action of the lower court in submitting to the jury the consideration of the negotiations concerning the alleged contract; but, as has been shown, this was a wise and reasonable thing to do, and counsel for the defendants acquiesced in it. Furthermore, the statute provides, in reference to appeals, that the Supreme Court “shall disregard any error or defect in the pleadings which shall not affect the substantial rights of the parties, and no judgment shall be reversed or affected by reason of such error or defect.” Sec. 20, Sess. Laws 1911, Ch. 6. The entire purpose of that act was to facilitate the speedy determination of causes and to lessen, if not prevent, the reversal of causes for technical reasons. New provisions of the statute have been so frequently cited, and so infrequently obeyed. The re-enactment in 1911 of that statute is a plain reminder that a similar statute, that had been in existence since 1877, had not been receiving the attention that the legislature intended. Technicalities should never be used to reverse a just judgment. The reversal of this judgment, in my opinion, cannot be based upon anything except that it was not found according to certain rules. In a very recent case, Taylor v. Thomas, 77 N. H., 410, 92 Atl., 740, the Supreme Court of New Hampshire said:
“It is now universally recognized that the object of a trial is to ascertain the truth by rational means. The sport *151 ftig theory — the theory that a judicial trial is a game to be played according to certain rules — has no more place in the present conception of the administration of justice than has the wager of battle.”
Just judgments are too frequently reversed because learned members of the bar boldly assert some technical rule, and so plausibly maintain it with citations and argument, based upon iron clad rules handed down to us from past ages, that the courts, sometimes in fear of reversal by a still higher tribunal, sometimes from the mistaken belief that it is the law, and. in some few instances from a lack of extended consideration, adopt such technical precedents and reverse just judgments because they were not recovered with that degree of nicety, science and art that does sometimes so adorn judicial procedure that even an unjust judgment is permitted to stand.
The majority opinion concedes that something might have been done by the lower court to permit the plaintiff to share in the stock of the new company; but plaintiff was not compelled to sue for a part of such stock, and the lower court sustained a money judgment, as sued for, which conferred the same benefit, and which defendants seemed to prefer, by acquiescing in the issues.
It is true, as the majority opinion indicates, that the record contained intimations of plaintiff’s ignorance. It clearly shows, also, his innocence; that he was not a shrewd man; that he knew nothing about the law, and that he was easily influenced and without ingenuity; “there are no tricks in plain and simple faith.”
Remanding for another trial means further expense to. plaintiff, the necessity of delay, another opportunity for defendants to defeat a just cause, simply to require a moye rigid enforcement of the technical rules of pleading and! practice. Such rules, like the statute of frauds, have been adopted to prevent fraud and injustice, not to permit and promote them.
*152 In 1 Thompson on Corporations, sec, 870, it is said:
“For the clearest reasons, the officers of a corporation will not be permitted to issue the stock belonging to the company to themselves, with the design and for the purpose of retaining themselves in office. * * * So, directors were enjoined from issuing new stock immediately prior to an election for the sole purpose of controlling it. * * * They show a clear case of fraud upon the rights of the existing stockholders.”
For a much greater reason, is it fraud for directors to elect themselves by the vote of shares that have never been paid for, with their knowledge.
Fraud is not readily classified or defined and the courts usually avoid attempting it; it “is so various in form and color that it is difficult, if not impossible, to confine it within the limits of any precise definition.” ' Kerr on Fraud and Mistake, page 42.
This author further says:
“The fertility of man’s invention in devising 'new schemes of fraud is so great, that courts of equity have declined the hopeless attempt of embracing in one formula allots varieties of form and color, reserving to themselves the liberty to deal with it under whatever form it may present itself.”
In the case of Hanger et al. v. Evine et al., 38 Ark., 334, 346, the court said:
“The criterion is the good sense of the jury, estimating the character of the transaction by applying to the evidence their general knowledge of human motives, and their sense of dealing. Fraud is manifold in its devices, and its ingredients cannot be so defined as to include all cases, save by. such general statements as must, after all, refer the question to the judgment of the jury upon the facts. Twelve men, taken from the mass of citizens, will rarely fail to detect a fraudulent intent, if any such existed, from all the circumstances.”
*153 Decided February 11, A. D. 1914.
Rehearing granted April 12, A. D. 1915. Judgment reversed. Rehearing denied appellee June 18, A. D. 1915.
In the case of Kirby v. Ingersoll, 1 Har. Ch. 172, 190, a case in which one partner, without the consent of his co-partner, made an assignment for the benefit of creditors, the court said:
“By the term fraud, it should be remembered that the legal intent and effect of the acts complained of is meant. The law has a standard for measuring the intent of parties, and declares an illegal act, prejudicial to the rights of others, a fraud upon such rights, although the parties deny all intention of committing a fraud.”
Creighton’s failure to testify had. its weight with the judge and jury.
“The failure of a party to testify in his own behalf as to disputed matters within his personal knowledge warrants the inference that his testimony .would be unfavorable to his contention on those points.” 9 Ene. Ev. 969.
“Where a party is charged with fraud and fails to come forward and testify to repel the charge, he generates by his failure an unfavorable presumption against his cause.” Stephenson v. Kilpatrick, 166 Mo., 262, 65 S. W., 773.
“When it is reasonably within the power of a party to offer evidence upon the facts and rebut the inferences which the circumstances tend to establish against him, and he fails to offer such proof, to rebut same, the natural conclusion is that the proof, if produced, would support the inferences against him, and the jury is justified in acting upon that conclusion.” A. T. & S. F. Ry. vs. Davis et al., 26 Okla. 359, 364, 109 Pac. 551, 553.
I think a reasonable and fair administration of justice demands the affirmance of the judgment.